IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SCOTT DIDONATO | : | CIVIL ACTION |
| v. | : | |
| UNITED STATES OF AMERICA | : | NO. 10-5760 |

MEMORANDUM

McLaughlin, J.                                            March 31, 2011

The plaintiff, Scott DiDonato,[1] is a former United States Marine who has asserted claims against the United States under the Federal Tort Claims Act ("FTCA"). The plaintiff's claims sound in legal malpractice, and are predicated largely on events that occurred between 2003 and 2004, after the plaintiff was discharged from the Marines under "other than honorable" conditions. The plaintiff's claims arise out of his attempts to have his discharge status upgraded, or alternatively to re-enlist in the Marine Corps.

The defendant has filed a motion to dismiss on the basis of timeliness, intra-military immunity, and the statutory text of 28 U.S.C. § 2680(h), which renders certain claims non-actionable under the FTCA. After a full round of briefing, the Court held oral argument on March 30, 2011. For the following

---

[1] The plaintiff was formerly known as Scott Toelk, but changed his name to Scott DiDonato at some point during the events that gave rise to this litigation.

1

reasons, the Court will now grant the motion to dismiss.

I.  Facts as Alleged in the Complaint

In evaluating a motion to dismiss under Rule 12(b)(6), a court must accept all well-pleaded facts as true, and must construe the complaint in the light most favorable to the plaintiff.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).[2]

The plaintiff, Scott DiDonato, joined the United States Marine Corps and was shipped to boot camp for basic training in October 1999.[3]  At boot camp, the plaintiff's drill instructors required the plaintiff to participate in "waterbowling," a ritual where recruits were made to drink several canteens of water.  During one such incident, the plaintiff felt a rip in his stomach, and was subsequently diagnosed with a serious hernia.

---

[2] When evaluating a motion to dismiss, the court should disregard any legal conclusions.  The court must then determine whether the facts alleged are sufficient to show that the plaintiff has a "plausible claim for relief."  Fowler, 578 F.3d at 210.  If the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, then the complaint has alleged, but it has not shown, that the pleader is entitled to relief.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2008).

[3] Prior to joining the Marine Corps, the plaintiff served in the United States Army for three years, three months and twenty-one days. Compl. ¶ 29.

2

Following surgery,[4] the plaintiff was placed on "no duty" and then "light duty" status to aid his recovery. Compl. ¶¶ 32, 34-35, 38-39.

After surgery, the plaintiff was assigned to the Basic Marine Platoon, where his new drill instructor forced the plaintiff to exceed the limits of his "no duty" status, resulting in extreme pain. The plaintiff reported his drill instructor's actions to his command and enlisted the help of his Congressman, Robert Andrews. The plaintiff was granted convalescent leave and returned home to New Jersey. However, out of concern for his safety, the plaintiff did not return to duty at the expiration of his convalescent leave. On March 16, 2000, Congressman Andrews informed the plaintiff that he must return to duty, but that the plaintiff's complaints would be investigated. Compl. ¶¶ 42-48.

Following his return, the plaintiff was punished for his unauthorized absence, but was nonetheless promoted to Camp Lejeune with his peers on May 15, 2000. At Camp Lejeune, the plaintiff repeatedly asked about the status of the investigation into his maltreatment, but received no response and was ridiculed. The plaintiff subsequently graduated on September 1, 2000, and reported to duty at Quantico, Virginia. Compl. ¶¶ 49-52, 54-59.

---

[4]The surgery was negligently performed and resulted in the plaintiff's being unable to have children. Compl. ¶ 41.

3

At Quantico, the plaintiff concluded that the indifference and abuse he had suffered would continue, and decided to return home to New Jersey and again seek the help of Congressman Andrews. The Congressman contacted the Commandant of the Marine Corps and requested an investigation into the plaintiff's abuse. The Congressman also informed the plaintiff that he must return to Quantico before the Marine Corps would take any additional action on his behalf. Compl. ¶¶ 61-62, 64-66, 68.

On November 12, 2000, the plaintiff voluntarily returned to Quantico. The plaintiff's commanding officer, Colonel Applegate, assigned the plaintiff to a "casual platoon" consisting of long-term deserters, even though the plaintiff had been gone only a short while. Although the plaintiff wanted to remain a Marine, Colonel Applegate arbitrarily decided that the plaintiff could not remain in the Marine Corps, based on Colonel Applegate's erroneous belief that the plaintiff could not be trained for another specialty. Colonel Applegate also ordered the plaintiff to take an "other than honorable" discharge rather than stand for trial. Faced with no choice, the plaintiff received an "other than honorable" discharge on January 9, 2001. Compl. ¶¶ 70, 75-76, 81, 90-95, 99.

In 2003, the plaintiff contacted Colonel Applegate and sought assistance in having his discharge status upgraded, or

alternatively in re-enlisting in the Marine Corps. Colonel Applegate in turn sought the help of Captain Kasey Shidell, a lawyer in the Naval Judge Advocate General's Corps ("JAG"), and Darhrie Hayman, an individual employed at Manpower Management Evaluation Review ("MMER"). Compl. ¶ 110-12.

All three of these individuals provided ineffective assistance to the plaintiff. Colonel Applegate and Captain Shidell's assistance posed a conflict of interest, because both men were employed by the United States government when they represented the plaintiff. Neither Colonel Applegate nor Captain Shidell ever advised the plaintiff to consult an outside lawyer. Compl. ¶¶ 115, 160.

Colonel Applegate and Captain Shidell also provided the plaintiff with erroneous legal advice. Both individuals informed the plaintiff that he should petition the Board for Correction of Naval Records ("BCNR") to upgrade his re-enlistment code if he wanted to re-enlist in the Marines. This was flawed advice, however, because the BCNR will not upgrade a re-enlistment code if a petitioner has an "other than honorable" discharge. The proper channel would have been for the plaintiff to petition the Naval Discharge Review Board ("NDRB") to have his discharge upgraded. Only after his discharge was upgraded should the plaintiff have petitioned the BCNR to upgrade his re-enlistment code. Compl. ¶¶ 113-14, 116-18.

5

Colonel Applegate, Captain Shidell and Ms. Hayman engaged in fraudulent conduct in the course of assisting the plaintiff. Captain Shidell directed the plaintiff to send a release to Ms. Hayman authorizing Captain Shidell to access the plaintiff's official personnel file. Ms. Hayman then permitted Captain Shidell to insert documents into the plaintiff's file without allowing the plaintiff an opportunity to review these documents. Many of the letters that Captain Shidell placed in the plaintiff's file contained misrepresentations. This fraudulent activity prevented the plaintiff from learning that he had received erroneous legal advice. Compl. ¶¶ 130, 135-37.

In June 2004, the BCNR denied the plaintiff's petition. At that time, the plaintiff requested and received a copy of his BCNR file so that he could "review the entire package." The plaintiff additionally requested that Congressman Andrews "look into the process and entire affair." It was not until 2008, however, that the plaintiff learned that he had pursued the wrong remedy. Specifically, on October 22, 2008, three individuals at the BCNR were contacted by an unidentified person,[5] and those individuals explained that the BCNR will not upgrade a re-enlistment code if a petitioner has an "other than honorable"

---

[5] The plaintiff alleges that he retained independent counsel sometime in 2007, and that the plaintiff's attorney conducted an investigation on his behalf. Presumably, the BCNR employees were contacted by the plaintiff's attorney.

6

discharge.  Compl. ¶¶ 116-19, 138-40, 166.

Throughout 2004, the plaintiff continued to engage the assistance of Congressman Andrews.  On September 13, 2004, Congressman Andrews sent a letter to the Marine Corps raising many of the plaintiff's concerns, particularly with respect to the manner in which the plaintiff had been discharged.  The plaintiff subsequently received a response from the Marines with a copy of the letter from Congressman Andrews, but the letter had been falsely altered.  Captain Shidell was in charge of answering congressional inquiries and would have been the one to answer Congressman Andrews' inquiry.  Compl. ¶¶ 167-70, 176-77.

Around February 2008, the plaintiff again contacted Colonel Applegate for assistance in re-enlisting in the Marines.  Colonel Applegate developed a "plan" to help the plaintiff re-enlist, and the plaintiff underwent a series of evaluations.  The process was dilatory and the plaintiff was treated with varying degrees of respect in view of his discharge status.  In addition, favorable information was omitted from the plaintiff's re-enlistment package.  Compl. ¶¶ 189, 196-97, 203-10.

In October 2008, the plaintiff was informed that his re-enlistment was a "done deal" and would be finalized during an in-person meeting with Lieutenant General Coleman.  The plaintiff was informed that he would not be permitted to bring his lawyer

to this meeting.[6]  Nonetheless, the plaintiff insisted on having his lawyer present to ensure his rights were protected.  The meeting with Lieutenant General Coleman was therefore cancelled, and on November 26, 2008, Lieutenant General Coleman denied the plaintiff's re-enlistment without reason or rationale.  Compl. ¶¶ 262, 270-72, 300-02, 310.

The plaintiff subsequently filed an administrative claim with the Naval Claims Office, which was received on December 8, 2008.  Final review of the plaintiff's administrative claims terminated on May 4, 2010, when the claims were rejected as untimely and barred by military immunity.  The plaintiff filed the present FTCA action against the United States on October 29, 2010.

At oral argument held on March 30, 2011, the plaintiff clarified that he is exclusively asserting a claim for legal malpractice against the United States, notwithstanding any allegations in the complaint to the contrary.[7]  The plaintiff explained that his legal malpractice claim is based on the conflict of interest inherent in Colonel Applegate and Captain

---

[6]The plaintiff does not identify at what point he hired a new lawyer.  However, it appears that the plaintiff hired an outside lawyer sometime in late 2007 and the lawyer helped the plaintiff prepare a re-enlistment package.

[7]For instance, the plaintiff alleges fraudulent misrepresentation by Colonel Applegate, Captain Shidell and Ms. Hayman throughout the complaint.  At oral argument, however, the plaintiff indicated that he is not asserting a claim for fraud.

Shidell's representation of the plaintiff in 2003 to 2004, and the negligent advice they provided in the course thereof.

II. Analysis

1. Statute of Limitations

The defendant has moved to dismiss on the basis of the FTCA's two year statute of limitations. The defendant points out that the Naval Claims Office received the plaintiff's administrative claim on December 8, 2008, and therefore all claims accruing prior to December 8, 2006, are time-barred. Because the plaintiff's legal malpractice claim is predicated on events that occurred during 2003 to 2004, the defendant argues that they are untimely.

The plaintiff argues that application of the "discovery rule" should delay the accrual of his cause of action. The plaintiff contends that he did not learn about the conflict of interest inherent in Colonel Applegate and Captain Shidell's representation of him, or the negligent advice provided in connection therewith, until the plaintiff obtained independent counsel sometime in 2007 or 2008. According to the plaintiff, Captain Shidell's practice of altering documents further concealed any negligence, which could not have been discovered before the plaintiff obtained new counsel.

The Federal Tort Claims Act is a limited waiver of the United States' sovereign immunity. Under the FTCA, a claim

9

against the United States is forever barred unless it is presented to the appropriate federal agency "within two years after such claim accrues." 28 U.S.C. § 2401(b). The determination of when a claim accrues under the FTCA is a question of federal rather than state law. Zeleznik v. United States, 770 F.2d 20, 22 (3d Cir. 1985).

For tort actions, a cause of action generally accrues at the time when a putative plaintiff is injured. However, the United States Supreme Court and the Court of Appeals for the Third Circuit have applied a "discovery rule" to claims under the FTCA. Under the discovery rule, the statute of limitations begins to run when the injured party "possesses sufficient critical facts to put him on notice that a wrong has been committed and that he need investigate to determine whether he is entitled to redress." Zeleznik, 770 F.2d at 23 (citing United States v. Kubrick, 444 U.S. 111 (1979)).

In most instances, a cause of action accrues at the time the injured party learns of his injury. However, where the fact of an injury alone is insufficient to put a party on notice of its cause, the claim will not accrue until the injured party "learns of both the fact of his injury and its cause." Zeleznik, 770 F.2d at 23. The discovery rule does not, however, delay the accrual of a plaintiff's claim until he is aware that his injury was negligently inflicted and that he may have a cause of action.

10

See Kubrick, 444 U.S. at 123.[8]

The Court concludes that the plaintiff's claims are untimely. The plaintiff learned of the fact of his injury in June 2004 when the BCNR denied the plaintiff's petition to upgrade his re-enlistment code. Assuming that the fact of the injury was insufficient to put the plaintiff on notice of its cause, the allegations in the complaint indicate that the plaintiff also had notice of possible negligence as early as 2004. Following the denial of his petition, the plaintiff requested his BCNR file so that he could review the "entire package." Compl. ¶ 140. The plaintiff had certain "suspicions" upon receipt of the BCNR file, which led him to contact Congressman Andrews in July and August of 2004 to request that

---

[8] In Kubrick, the plaintiff sought treatment at a Veterans' Administration hospital, where he received an antibiotic that caused him to go deaf. Two years later, the plaintiff consulted an attorney who informed the plaintiff that he may have received negligent care. The Supreme Court concluded that the plaintiff's subsequent medical malpractice claim under the FTCA was time-barred. The plaintiff learned both the fact and the cause of his injury when he took an antibiotic and went deaf. At that point, the plaintiff could have consulted professionals to determine if he had a cause of action. The Court concluded that the discovery rule did not delay accrual of the claim until the plaintiff was advised of possible negligence. Kubrick, 444 U.S. at 123-24.

11

the Congressman look into the "entire affair."⁹  Compl. ¶¶ 139, 166.

The plaintiff also alleges that he first became aware that certain documents had been altered when he received his BCNR file. Specifically, the plaintiff alleges that he discovered "for the first time when he got a copy of his BCNR file" that Captain Shidell had placed factually inaccurate letters into said file. Compl. ¶ 145. In addition, the plaintiff alleges that he received copies of letters from Congressman Andrews in 2004 that had clearly been altered, and the plaintiff suspected that Captain Shidell may have been involved. Compl. ¶¶ 170-77.

Based on these allegations, the Court concludes that the plaintiff possessed the "critical facts" in 2004 to put him on notice that negligence may have caused his injury. The plaintiff believed something was amiss when his petition was denied, which prompted him to request his file from the BCNR. The contents of that file were sufficient to raise suspicion, which led the plaintiff to enlist the help of his Congressman.

---

⁹In a related action before this Court involving the same plaintiff, the record contains a letter from the BCNR to the plaintiff dated June 3, 2004, informing the plaintiff that his petition was denied. The letter explains that the BCNR did not consider the plaintiff's discharge characterization, because the plaintiff had neither requested such consideration nor had he exhausted his administrative remedies before the NDRB. The letter informs the plaintiff of his right to apply to the NDRB to have his discharge characterization changed. June 3, 2004, BCNR Letter, Ex. 5 to the Def.'s Br. in Support of Mot. for Summ. J., in Didonato v. Zilmer, No. 10-4205.

In view of the plaintiff's concerns about the process in general and Captain Shidell's role in particular, the plaintiff was on notice that he may have received negligent advice.[10] It was therefore incumbent on the plaintiff to conduct an inquiry to determine whether he had a possible cause of action. See Kubrick, 444 U.S. at 122; Zeleznik, 770 F.2d at 23. The fact that the plaintiff was not apprised of his legal rights until he consulted a lawyer in 2007 did not delay the accrual of the cause of action.[11]

The plaintiff's arguments with respect to Colonel Applegate and Captain Shidell's conflict of interest are similarly unavailing. The plaintiff alleges that he enlisted Colonel Applegate's assistance in 2003 because the latter had

---

[10] The plaintiff's argument that Colonel Applegate and Captain Shidell covered up their negligence by altering documents is undermined by the allegations in the complaint that the plaintiff discovered that documents had been altered in 2004.

[11] The plaintiff cites to Mossow v. United States, 987 F.2d 1365 (8th Cir. 1993), where the Eighth Circuit applied the discovery rule and concluded that a plaintiff's legal malpractice claim had not accrued until the plaintiff contacted an independent lawyer. However, Mossow is distinguishable from the present case. In Mossow, the plaintiff received allegedly negligent advice that he did not have an actionable claim. As a consequence, the plaintiff did not bring suit, and the statutory period expired. It was not until the plaintiff contacted a second attorney and learned that his original claim had been actionable, but would now be untimely, that the plaintiff "discovered the facts and cause of his legal malpractice." Mossow, 987 F.2d at 1367-68. In the present case, the plaintiff discovered the fact and cause of his injury in 2004, when his petition was denied and the plaintiff requested his BCNR file.

13

been the plaintiff's commanding officer.  The plaintiff also
communicated directly with Captain Shidell in the course of
preparing his BCNR petition.  Therefore, taking the allegations
as true, the plaintiff knew that both of men were acting on his
behalf.  The plaintiff has alleged no facts indicating that he
was unaware that these two men were United States government
employees.  Therefore, the plaintiff's argument that he could not
have discovered the conflict of interest before 2007 or 2008 is
unconvincing.  Instead, the complaint suggests that the plaintiff
was unaware of the Professional Rules of Conduct governing JAG
lawyers until 2007 or 2008.  The discovery rule, however, does
not delay the accrual of a cause of action when a plaintiff is
merely ignorant of his legal rights.  See Kubrick, 444 U.S. at
122.

Applying the discovery rule, the Court concludes that
the plaintiff's cause of action accrued no later than July or
August of 2004, when the plaintiff received his BCNR file and
contacted Congressman Andrews.  However, the plaintiff did not
file his administrative claim until December 8, 2008.  Therefore,
the plaintiff's claims are time-barred.

2.  Other Bases for Dismissal

Because the Court concludes that the plaintiff's claims
are untimely, it need not determine whether the complaint must be
dismissed on other grounds.  However, the Court notes that the

14

defendant has advanced a strong argument for the application of the intra-military immunity doctrine, first articulated by the Supreme Court in Feres v. United States, 340 U.S. 135 (1950).

In Feres, the Supreme Court held that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." Id. at 146. The intra-military immunity doctrine is predicated upon the "adverse impact on military discipline inherent in the judicial review of military orders." Matreale v. New Jersey Dept. of Military & Veterans Affairs, 487 F.3d 150, 154 (3d Cir. 2007). In view of the "compelling necessity of maintaining military discipline," courts have expanded the immunity doctrine to a broad range of claims asserted by servicemen. Id. at 153.[12] Immunity will often apply where maintenance of the suit would require the Court to second-guess military orders or decisions. See Stencel Aero

---

[12]For instance, Feres has been applied to both intentional and negligent torts. Jaffee v. United States, 663 F.2d 1226 (3d Cir. 1981). In addition, it has been applied to claims not only under the FTCA, but also to Bivens claims against military officers and civilians for violations of constitutional rights. Matreale, 487 F.3d at 153-54 (citations omitted). However, Feres immunity does not apply where an action does not "arise from" and is not "incident to" service. See, e.g., Brooks v. United States, 337 U.S. 49 (1949) (concluding FTCA suit not barred where off-duty serviceman was struck and killed by Army truck, because claim unrelated to service); United States v. Brown, 348 U.S. 110 (1954) (concluding former serviceman's medical malpractice suit not barred by Feres where injury in question occurred after discharge, when plaintiff enjoyed civilian status).

15

Eng'g Corp. v. United States, 431 U.S. 666, 671 (U.S. 1977).

The Court is concerned that adjudication of the plaintiff's legal malpractice claims would require the Court to second-guess military protocol. As an initial matter, the Court would be required to assess the propriety of Colonel Applegate and Captain Shidell's representation of the plaintiff. The Court would also have to make a determination as to whether these individuals provided legal advice, or advice more akin to what would be provided by human resources personnel, as the defendant contends. Finally, the Court would be required to examine standards of military conduct to determine whether the conduct of these individuals fell short of those standards. In sum, this is precisely the sort of case where Feres may apply.[13]

The Court will not definitively answer this question, however, because it has concluded that the plaintiff's claims are time-barred. The Court will accordingly grant the defendant's motion to dismiss.

An appropriate order shall issue separately.

---

[13] Although the plaintiff was a civilian at the time that the alleged legal malpractice took place, the Court is not convinced that this case should be governed by Brooks and Brown rather than Feres. In contrast to Brown, where the post-discharge injury sounded in medical malpractice and therefore would not require the Court to second-guess military protocol, the present action would require the Court to inquire into standards of military conduct.

16